1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10                              ----oo0oo----

11

THERESA MARIE NIESEN,                Civ. No. 2:14-2921 WBS CKD
12
                  Plaintiff,
13                                   MEMORANDUM AND ORDER RE: MOTIONS
        v.                           FOR SUMMARY JUDGMENT
14
L. GARCIA, YOLO COUNTY
15  SHERIFF'S DEPUTY; J. CEJA,
    YOLO COUNTY SHERIFF'S DEPUTY;
16  J. LAZARO, YOLO COUNTY
    SHERIFF'S DEPUTY; M. NEVIS,
17  YOLO COUNTY SHERIFF'S DEPUTY;
    OFFICER BIGELOW, ANIMAL
18  CONTROL OFFICER FOR YOLO
    COUNTY; YOLO COUNTY SHERIFF'S
19  DEPARTMENT; YOLO COUNTY
    PROBATION DEPARTMENT, and
20  Does 1 through 50, et al.,

21                  Defendants.

22

23                              ----oo0oo----

24          Plaintiff Theresa Niesen brought this civil rights

25  action under 42 U.S.C. § 1983 alleging that defendants violated

26  her Fourth Amendment rights by unlawfully seizing her dogs and

27  arresting her following a probation search of her home.  The

28  matter is now before the court, pursuant to Federal Rule of Civil

                                   1

Procedure 56, on (1) defendants Yolo County Sheriff's Deputies

Lech Garcia, Juan Ceja, and Jerry Lazaro's ("Deputies") motion

for summary judgment on all of plaintiff's claims, (Docket No.

20), and (2) defendants Yolo County Animal Control Officers

Michael Nevis and Vanus Bigelow's ("Officers") motion for summary

judgment on all of plaintiff's claims, (Docket No. 21).

I.   <u>Factual and Procedural Background</u>

On June 26, 2012, Shane Edington was sentenced in the

Superior Court of California, County of Yolo, to three years'

summary probation for various misdemeanor convictions.  (Req. for

Judicial Notice ("RJN") Ex. A (Docket No. 20-3).)[1]  The terms of

Edgington's probation required him to submit to any search of his

person, vehicle, or residence for stolen property "at any time of

day or night[,] with or without [a] warrant, upon the request of

any peace officer."  (<u>Id.</u>)

In December 2012, Yolo County Sheriff's Deputy Lazaro

planned to conduct a probation search of Edgington.  (Dehoff

Decl. Ex. H ("Lazaro Dep.") at 6:25-22:6 (Docket No. 20-4).)  To

obtain Edgington's most recent address, Deputy Lazaro spoke with

---

[1]    Plaintiff does not oppose defendants' requests for
judicial notice.  The court "may take notice of proceedings in
other courts, both within and without the federal judicial
system, if those proceedings have a direct relation to matters at
issue."  <u>United States ex rel. Robinson Rancheria Citizens
Council v. Borneo, Inc.</u>, 971 F.2d 244, 248 (9th Cir. 1992)
(citation omitted); <u>see</u> Fed. R. Evid. 201.  The court takes
judicial notice of the following records filed in Yolo County
Superior Court in <u>People v. Edgington</u>, No. CR-M-12-58, and <u>People
v. Niesen</u>, No. CR-F-12-2023-2: (1) Edgington's June 26, 2012
probation sentence; (2) August 10, 2012 and January 15, 2013
bench warrants for Edgington; and (3) August 10 and October 23,
2012 docket entries and minute orders as to Edgington.

1  a confidential informant that he had used on five previous

2  occasions and believed to be reliable.  (Id.)  The informant told

3  Deputy Lazaro that Edgington resided with plaintiff, his

4  girlfriend, at 138 Antelope Street in Woodland, California (the

5  "House").  (Id.)  Deputy Lazaro then followed up with Yolo County

6  Superior Court's Criminal Division to inquire about Edgington's

7  most recent listed address.  (Id.)  The court informed Deputy

8  Lazaro that its master court file listed Edgington's current

9  address as 138 Antelope Street in Woodland, California.  (Id.;

10  see Dehoff Decl. Ex. G.)

11      Based on this information and believing that Edgington

12  resided in the House, Deputies Lazaro, Ceja, and Garcia arrived

13  at the House on December 17, 2012 at 9:00 a.m. to conduct the

14  probation search.  (Lazaro Dep. at 22:16-24:10.)  Plaintiff, who

15  resided in the House, was not home at the time of the probation

16  search.  (Dehoff Decl. Ex. L ("Van Asperen Dep.") at 9:14-15:19;

17  Dehoff Decl. Ex. N ("Niesen Dep.") at 12:9-13:11.)  The Deputies

18  knocked on the front door and announced themselves as sheriffs.

19  (Lazaro Dep. at 23:1-23.)  After receiving no response, the

20  Deputies entered the House through the front door.  (Id.; Dehoff

21  Decl. Ex. J ("Garcia Dep.") at 12:16-15:19.)  The Deputies

22  encountered one male, Vincent Van Asperen, and one female, Carol

23  Vitalie, on the sofa in the living room.  (Lazaro Dep. at 23:24-

24  24:10.)  Van Asperen and Vitalie consented to a search of their

25  persons, which revealed a methamphetamine glass pipe in each of

26  their possessions.  (Id. at 61:1-21; Garcia Dep. at 15:20-18:18.)

27      Deputy Lazaro performed a protective sweep of the House

28  and found a bedroom with a closed door in the back of the House.

3

1  (Lazaro Dep. at 27:16-30:10.)  Upon partially opening the bedroom

2  door, Deputy Lazaro observed three pit bull terriers barking and

3  growling, video monitoring equipment that showed the front of the

4  House, and an open sliding glass door on the other side of the

5  room leading out to the backyard.  (Id.)  Suspecting that

6  Edgington was in the bedroom and had taken off, Deputy Lazaro

7  called Animal Control to secure the three pit bulls so the

8  Deputies could search the bedroom.[2]  (Id. at 58:21-59:2; Dehoff

9  Decl. Ex. I ("Ceja Dep.") at 52:11-53:14.)

10       Animal Control Officer Nevis arrived a short time later

11  with a snare pole used for catching, holding, and releasing

12  animals.  (Lazaro Dep. at 30:11-32:14; Dehoff Decl. Ex. K ("Nevis

13  Dep.") at 12:5-13:25.)  Officer Nevis and Deputy Lazaro, who had

14  his Taser out, partially opened the bedroom door and observed the

15  three pit bulls barking and growling inside.  (Lazaro Dep. at

16  30:11-32:14.)  Officer Nevis snared the first pit bull and began

17  to lead it out of the bedroom.  (Id.)  As Nevis was leading the

18  snared dog out of the door, the second pit bull jumped over the

19  snared dog and advanced toward Officer Nevis.  (Id.)  Deputy

20  Lazaro tased the second pit bull and momentarily subdued it.

21  (Id.)  The third pit bull then ran out of the bedroom and, in

22  doing so, dislodged the Taser wires attached to the second dog,

23  which stopped the shocking process and freed it.  (Id.)  The two

24

25       [2]  The Yolo County Animal Control Division, also known as
   Animal Services, is a division of the Yolo County Sheriff's
26  Department that provides animal control services to the County
   and cities therein, including the City of Woodland.  See Yolo
27  County Code §§ 6-1.201, 6.1-202; City of Woodland, Cal. Code of
   Ordinances § 3-1-1.
28

4

1  free pit bulls then ran down the hallway toward the living room,

2  and Deputy Lazaro yelled a warning to the other Deputies.  (<u>Id.</u>;

3  Nevis Dep. at 12:5-13:25.)

4       One pit bull ran toward Deputy Ceja, who initially shot

5  it three times and then four additional times when it "continued

6  to come at [him]."  (Ceja Dep. at 19:15-23:12, 28:2-23, 54:7-

7  55:3.)  The other pit bull ran toward the sofa where Van Asperen,

8  Vitalie, and Deputy Garcia were.  Deputy Garcia shot the pit bull

9  twice from six to eight feet away as it ran toward them.  (Garcia

10  Dep. at 24:24-26:1; Van Asperen Dep. at 40:24-41:9.)  Animal

11  Control Officer Bigelow subsequently arrived at the House and

12  took possession of the snared dog from the bedroom, as Officer

13  Nevis and Deputy Ceja placed the two wounded pit bulls in Nevis'

14  vehicle and Nevis drove them to an animal clinic at the

15  University of California at Davis, School of Veterinary Medicine.

16  (Ceja Dep. at 27:12-17, 29:4-12; Dehoff Decl. Ex. O-1 ("Bigelow

17  Dep.") at 15:17-17:12 (Docket No. 21-3).)  By the time Officer

18  Nevis reached the clinic, however, the dogs had died from their

19  wounds.  (Nevis Dep. at 14:7-9, 20:16-21:24.)

20       The Deputies then searched the remainder of the House.

21  In the bedroom they found (1) .35 grams of methamphetamine; (2) a

22  glass smoking pipe; (3) a letter from Yolo County Superior Court

23  addressed to Edgington at the House's address; and

24  (4) Edgington's name written on boxes containing clothes and

25  other belongings.  (Lazaro Dep. at 37:1-52:7, Ex. 5.)  The

26  Deputies and Officers also found three more pit bulls in a kennel

27  in the backyard and another pit bull in the garage of the House.

28  (<u>Id.</u>; Ceja Dep. at 31:13-35:25; Niesen Decl. ¶¶ 8-9 (Docket No.

1   26-1).)

2           Officer Nevis returned to the House and, together with

3   Officer Bigelow, snared and removed the remaining dogs and

4   transported them to the Yolo County Animal Services shelter

5   pending reclamation by their owner.  (Ceja Dep. at 31:13-16;

6   Nevis Dep. at 22:7-254:7; Bigelow Dep. at 17:18-18:23; Niesen

7   Decl. ¶ 12.)  Van Asperen and Vitalie were placed under arrest

8   for possession of drug paraphernalia and transported to Yolo

9   County Jail.  (Lazaro Dep. at 61:1-63:13; Garcia Dep. at 30:2-17;

10  Van Asperen Dep. at 31:7-33:15.)  At approximately 11:40 a.m.,

11  the Deputies declared the House secure and left the premises.

12  (Ceja Dep. at 36:16-17.)

13          Upon returning from the search, Deputy Lazaro filled

14  out and signed a declaration for probable cause to arrest

15  plaintiff for possession of a controlled substance and drug

16  paraphernalia based on the .35 grams of methamphetamine and glass

17  smoking pipe found in her bedroom.  (Lazaro Dep. at 45:19-46:14.)

18  On December 19, 2012, pursuant to the probable cause declaration,

19  Deputy Ceja returned to the House with three other deputies and

20  arrested plaintiff.  (Ceja Dep. at 37:19-40:23, 59:20-65:3.)

21  Plaintiff spent two days in Yolo County Jail because she was

22  unable to post bail.  (Niesen Decl. ¶¶ 18-20.)  On December 21,

23  2012, she was released and informed that the District Attorney

24  declined to prosecute her for the drugs and paraphernalia found

25  during the December 17, 2012 search.  (Id. ¶ 20; Niesen Dep. at

26  175:19-176:21.)[3]  Following the incident, plaintiff could afford

27  _____

28  [3]     At the time, and unrelated to the events in this case,

1    to retrieve only three of her five dogs from Animal Services.

2    (Niesen Decl. ¶¶ 14-16.)

3           Plaintiff filed a Complaint for damages on September

4    12, 2016, alleging claims under 42 U.S.C. § 1983 against Deputies

5    Lazaro, Ceja, and Garcia and Officers Bigelow and Nevis.  (Compl.

6    ¶¶ 1-14 (Docket No. 1).)[4]  Plaintiff alleges that (1) the killing

7    of her two dogs and seizure of her five other dogs on December

8    17, 2012 constituted an unreasonable search and seizure in

9    violation of her Fourth Amendment rights, and (2) plaintiff's

10   arrest on December 19, 2012 and ensuing detention violated her

11   Fourth Amendment rights because "there was no evidence that

12   Plaintiff had committed any crime."  (Id. ¶¶ 17-25.)[5]

13          Plaintiff seeks emotional distress and punitive damages

14   and compensatory damages for the loss of the value of her two

15   dogs that were killed, the amount she paid to retrieve three of

16   her other dogs from Animal Services, and the loss of the value of

17

18   _____

19   plaintiff was already being separately prosecuted for felony
     possession of methamphetamine and misdemeanor possession of drug
20   paraphernalia.  (RJN Ex. F.)

21        [4]   Counsel for plaintiff acknowledged at the hearing that
     Officer Nevis was incorrectly identified as a deputy sheriff in
22   the Complaint.  (See Compl. ¶ 10; Nevis Dep. at 6:7-14.)

23        [5]   On April 16, 2015, the court dismissed plaintiff's
     third and fourth claims for violation of her due process rights
24   under the Fourteenth Amendment and Monell claim against the
     individually-named defendants.  (Docket No. 14.)  The court also
25   dismissed all of plaintiff's claims against Yolo County.  (Id.)
     Though the court granted plaintiff leave to amend her Complaint,
26   plaintiff filed a notice of non-opposition to the court's
     dismissal on May 8, 2015 and asked that her current Complaint
27   proceed in accordance with the court's dismissal Order.  (Docket
     No. 15.)
28

the two remaining dogs she could not afford to retrieve.  (Id.

¶¶ 5, 20.)  The Deputies and Officers now move for summary

judgment on plaintiff's Fourth Amendment claims.  (Docket Nos.

20-21.)

II.  Legal Standard

        A party may move for summary judgment on a "claim or

defense."  Fed. R. Civ. P. 56(a).  Summary judgment is proper if

there is no genuine issue of material fact and the moving party

is entitled to judgment as a matter of law.  Id.; Summers v.

Teichert & Son, Inc., 127 F.3d 1150, 1152 (9th Cir. 1997).  A

material fact is one that could affect the outcome of the case.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A

genuine issue exists if the evidence produced would allow a

reasonable trier of fact to reach a verdict in favor of the non-

moving party.  Id.

        The moving party bears the initial burden of

establishing that no genuine issue of material fact exists as to

the particular claim or defense.  Id. at 256.  Where the moving

party seeks summary judgment on a claim or defense for which it

bears the burden of proof at trial, it must affirmatively

demonstrate that no reasonable trier of fact could find for the

non-moving party on that claim or defense.  Soremekun v. Thrifty

Payless Inc., 509 F.3d 978, 994 (9th Cir. 2007).  If summary

judgment is sought on a claim or defense for which the non-moving

party bears the burden of proof at trial, the moving party must

either (1) produce evidence negating an essential element of the

non-moving party's claim or defense, or (2) show that the non-

moving party cannot produce evidence to support an essential

1  element of its claim or defense.  Celotex Corp. v. Catrett, 477

2  U.S. 317, 322-23 (1986).

3        Once the moving party has met its initial burden, the

4  burden shifts to the non-moving party to produce concrete,

5  specific evidence establishing a genuine issue of material fact.

6  Id. at 324; Anderson, 477 U.S. at 256.  To carry this burden, the

7  non-moving may not rely "solely on conclusory allegations

8  unsupported by factual data."  Taylor v. List, 880 F.2d 1040,

9  1045 (9th Cir. 1989).  Rather, it must produce sufficient

10  evidence beyond the pleadings that would allow a reasonable trier

11  of fact to find in its favor.  Anderson, 477 U.S. at 256.  If it

12  does so, then "there is a genuine issue of fact that requires a

13  trial."  Id. at 257.

14        In ruling on a motion for summary judgment, the court

15  may not weigh the evidence, make credibility determinations, or

16  determine the truth of the matters asserted, and it must view all

17  inferences drawn from the factual record in the light most

18  favorable to the non-moving party.  Id. at 249, 255; Matsushita

19  Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

20  "Thus, although the court should review the record as a whole, it

21  must disregard all evidence favorable to the moving party" unless

22  that evidence is "uncontradicted and unimpeached" and "comes from

23  disinterested witnesses."  Reeves v. Sanderson Plumbing Prods.,

24  Inc., 530 U.S. 133, 151 (2000) (citation omitted).

25  III. Discussion

26        Title 42 U.S.C. § 1983 provides that "[e]very person

27  who, under color of any [state law] subjects, or causes to be

28  subjected, any citizen of the United States . . . to the

1  deprivation of any rights, privileges, or immunities secured by

2  the Constitution and laws, shall be liable to the party injured."

3  42 U.S.C. § 1983.  "Section 1983 does not create substantive

4  rights; it merely serves as the procedural device for enforcing

5  substantive provisions of the Constitution and federal statutes."

6  Crumpton v. Gates, 947 F.2d 1418, 1420 (9th Cir. 1991) (citing

7  Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 617

8  (1979)).

9        To establish § 1983 liability, a plaintiff must show

10  both (1) the deprivation of a right secured by the Constitution

11  and laws of the United States, and (2) that the deprivation was

12  caused by a person acting under color of state law.  Am. Mfrs.

13  Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50 (1999); Chudacoff

14  v. Univ. Med. Ctr. of S. Nev., 649 F.3d 1143, 1149 (9th Cir.

15  2011).  Section 1983 "contains no state-of-mind requirement

16  independent of that necessary to state a violation of the

17  underlying constitutional right."  Daniels v. Williams, 474 U.S.

18  327, 329-30 (1986).  There is no dispute here that the various

19  defendants acted under color of state law.

20        A.   Shooting of the Two Dogs

21        The Fourth Amendment guarantees citizens the right "to

22  be secure in their . . . effects[ ] against unreasonable searches

23  and seizures . . . ."  U.S. Const. amend. IV.  "The killing of a

24  dog is a destruction recognized as a seizure under the Fourth

25  Amendment and can constitute a cognizable claim under § 1983."

26  San Jose Charter of Hells Angels Motorcycle Club v. City of San

27  Jose, 402 F.3d 962, 975 (9th Cir. 2005) ("Hells Angels")

28  (quotation marks and alterations omitted).  Plaintiff's first

10

1  § 1983 claim alleges that the Deputies' shooting of her two dogs

2  constituted unlawful seizures in violation of the Fourth

3  Amendment.[6]

4      1.   Deputies' Liability for Shooting the Dogs

5      The Deputies argue that summary judgment is warranted

6  because (1) they acted in self-defense in shooting plaintiff's

7  two dogs and thus did not violate plaintiff's Fourth Amendment

8  right; and (2) even if the court finds a Fourth Amendment

9  violation, the Deputies are entitled to qualified immunity

10  because a reasonable deputy under the same circumstances would

11  have believed that the probation search could not occur without

12  removing the dogs from the bedroom, Animal Control was the best

13  way to remove the dogs from the bedroom safely, and self-defense

14  justified the shootings when the dogs unexpectedly escaped from

15  the bedroom.

16      In suits under § 1983, qualified immunity "shields

17  government officials from civil damages liability unless the

18  official violated a statutory or constitutional right that was

19  clearly established at the time of the challenged conduct."

20  Taylor v. Barkes, 135 S. Ct. 2042, 2044 (2015) (per curiam).

21  Qualified immunity is an "immunity from suit rather than a mere

22  defense to liability."  Mitchell v. Forsyth, 472 U.S. 511, 526

23

24      [6]   Plaintiff's contention that defendants were "negligent
    in their efforts to secure" the dogs, (Compl. ¶ 19), is
25  immaterial to her § 1983 claim.  "Section 1983 imposes liability
    for violations of rights protected by the Constitution, not for
26  violations of duties of care arising out of tort law.  Remedy for
    violations of duties of care arising out of tort law.  Remedy for
27  the latter type of injury must be sought in state court under
    traditional tort-law principles."  Baker v. McCollan, 443 U.S.
28  137, 146 (1979).

11

1  (1985).  "The protection of qualified immunity applies regardless
2  of whether the government official's error is a mistake of law, a
3  mistake of fact, or a mistake based on mixed questions of law and
4  fact."  Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quotation
5  marks omitted).  "When properly applied, [qualified immunity]
6  protects 'all but the plainly incompetent or those who knowingly
7  violate the law.'"  Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011)
8  (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

9         "Determining whether a defendant is entitled to
10  qualified immunity involves a two-pronged analysis," which first
11  assesses whether, "[t]aken in the light most favorable to the
12  party asserting the injury, . . . the facts alleged show the
13  officer's conduct violated a constitutional right" and, if so,
14  "whether the right was clearly established."  Lacey v. Maricopa
15  County, 693 F.3d 896, 915 (9th Cir. 2012) (en banc) (internal
16  quotation marks and citations omitted).

17         Courts have discretion to decide "which of the two
18  prongs of the qualified immunity analysis should be addressed
19  first in light of the circumstances in the particular case at
20  hand."  Pearson, 555 U.S. at 236.  The Supreme Court has
21  recognized that delving into difficult constitutional questions
22  may be unnecessary when a court can resolve the case on qualified
23  immunity based on the lack of a clearly established right at the
24  time of the defendants' alleged misconduct.  See al-Kidd, 563
25  U.S. at 735 ("Courts should think carefully before expending
26  'scarce judicial resources' to resolve difficult and novel
27  questions of constitutional or statutory interpretation that will
28  'have no effect on the outcome of the case.'" (citing Pearson,

12

1    555 U.S. at 236–42)).

2              After considering the difficulty of the Fourth

3    Amendment question in this case, the court finds that this is the

4    type of case the Supreme Court had in mind when it determined

5    that a court may assume the existence of a constitutional

6    violation on the first inquiry and then determine whether the

7    constitutional right was clearly established.  See Reichle v.

8    Howards, 132 S. Ct. 2088, 2093 (2012) ("[C]ourts may grant

9    qualified immunity on the ground that a purported right was not

10   'clearly established' by prior case law, without resolving the

11   often more difficult question whether the purported right exists

12   at all.  This approach comports with our usual reluctance to

13   decide constitutional questions unnecessarily.").  The court will

14   therefore assume, without deciding, that the Deputies violated

15   plaintiff's Fourth Amendment right when they shot her two dogs

16   and determine whether the Deputies are nonetheless entitled to

17   qualified immunity because the right was not clearly established.

18             "To be clearly established, a right must be

19   sufficiently clear that every reasonable official would have

20   understood that what he is doing violates that right."  Id. at

21   2093 (quotation marks and alterations omitted).  "Whether the law

22   was clearly established is an objective standard; the defendant's

23   subjective understanding of the constitutionality of his or her

24   conduct is irrelevant."  Clairmont v. Sound Mental Health, 632

25   F.3d 1091, 1109 (9th Cir. 2011); see also al-Kidd, 563 U.S. at

26   736 (stating that "[t]his approach recognizes that the Fourth

27   Amendment regulates conduct rather than thoughts").  "If the

28   controlling law is not clearly established, an official cannot be

13

1 liable, because a reasonable person would not be expected to know

2 how to structure his conduct to avoid liability." <u>Cruz v. Kauai</u>

3 <u>County</u>, 279 F.3d 1064, 1069 (9th Cir. 2002) (quotation marks

4 omitted).

5 The right must be defined in a "particularized, and

6 hence more relevant, sense." <u>Saucier v. Katz</u>, 533 U.S. 194, 202

7 (1991); <u>see also</u> <u>Tolan v. Cotton</u>, 134 S. Ct. 1861, 1866 (2014)

8 (per curiam) ("[C]ourts should define the clearly established

9 right at issue on the basis of the specific context of the case."

10 (quotation marks omitted)).  The court must therefore strike a

11 balance between defining a right too generally so that the

12 definition necessarily leads to the conclusion that the right is

13 clearly established and defining it too narrowly so that prior

14 precedent must mirror the facts of the case in order to conclude

15 that the right has been clearly established.  <u>Saucier</u>, 533 U.S.

16 at 202-03.  The Supreme Court has emphasized that it has

17 "repeatedly told courts--and the Ninth Circuit in particular--not

18 to define clearly established law at a high level of generality.

19 The general proposition, for example, that an unreasonable search

20 or seizure violates the Fourth Amendment is of little help in

21 determining whether the violative nature of particular conduct is

22 clearly established." <u>al-Kidd</u>, 563 U.S. at 742 (citation

23 omitted).

24 "Even if the violated right was clearly established,

25 the Supreme Court recognized that it may be difficult for a

26 police officer fully to appreciate how the legal constraints

27 apply to the specific situation he or she faces.  Under such a

28 circumstance, if the officer's mistake as to what the law

14

1  requires is reasonable, the officer is entitled to the immunity

2  defense." Sjurset v. Button, 810 F.3d 609, 616 (9th Cir. 2015)

3  (alterations omitted) (citing Blankenhorn v. City of Orange, 485

4  F.3d 463, 471 (9th Cir. 2007)).   If reasonable officers could

5  disagree on whether they would have taken the alleged action,

6  qualified immunity must be granted.  Brittain v. Hansen, 451 F.3d

7  982, 988 (9th Cir. 2006) (citing Malley, 475 U.S. at 341)

8  (emphasizing that if "officers of reasonable competence could

9  disagree on th[e] issue, immunity should be recognized").

10       "[W]hether the law governing the conduct at issue is

11  clearly established is a question of law for the court." Act

12  Up!/Portland v. Bagley, 988 F.2d 868, 873 (9th Cir. 1993) (citing

13  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  "The plaintiff

14  bears the burden to show that the contours of the right were

15  clearly established." Clairmont, 632 F.3d at 1109.

16       For purposes of the qualified immunity analysis and

17  determining the facts relevant to the clearly established

18  inquiry, the court must view the evidence in the light most

19  favorable to plaintiff and resolve all factual disputes in favor

20  of plaintiff.  See Blankenhorn, 485 F.3d at 477 ("Where [factual]

21  disputes exist, summary judgment is appropriate only if

22  Defendants are entitled to qualified immunity on the facts as

23  alleged by the non-moving party.").  Here, it is undisputed that

24  the plaintiff's dogs were full-grown pit bulls.  (Van Asperen

25  Dep. at 62:1-3; Nevis Dep. at 17:18-21.)  There are genuine

26  disputes, however, about the propensities of the dogs leading up

27  to the shootings.  Defendants have consistently testified that

28  the dogs were extremely aggressive prior to the shootings.  (See,

1  e.g., Lazaro Dep. at 29:23-30:7 (describing the dogs as "really

2  big, aggressive, mean, barking, scratching, biting dogs"); Nevis

3  Dep. at 12:14-19 (testifying that, when he arrived to assist the

4  Deputies, the pit bulls in the bedroom were barking aggressively

5  and growling at him).)

6           Plaintiff, on the other hand, indicates that her pit

7  bulls were "family dogs and are friendly."  (Niesen Decl. ¶ 13.)

8  Van Asperen also testified that he had encountered plaintiff's

9  dogs twenty to thirty times over the course of several years and

10 had "[n]ever seen any of her dogs be aggressive" or bite anybody

11 and that they were "good pups" and were always friendly to

12 visitors.  (Van Asperen Dep. at 23:4-23, 38:9-40:23, 59:10-60:7.)

13 According to Van Asperen, the pit bull running toward Deputy

14 Garcia was a "[t]ail wagging, want to jump up on your lap, lick

15 you type of dog" and merely wanted to "give [him] a kiss because

16 that's what [plaintiff's] dogs do."  (Id. at 27:5-8, 39:19-21,

17 60:8-16.)

18          At the same time, however, plaintiff acknowledges in

19 her Complaint that the pit bulls that "came out of the bedroom

20 . . . were obviously upset at having strangers in their home."

21 (Compl. ¶ 19); see Am. Title Ins. Co. v. Lacelaw Corp., 861 F.2d

22 224, 226 (9th Cir. 1988) ("Factual assertions in pleadings . . .

23 are considered judicial admissions conclusively binding on the

24 party who made them.").  It is also undisputed that the dogs were

25 running toward the Deputies when they exited the bedroom.  (See,

26 e.g., Van Asperen Dep. at 64:20-22; Ceja Dep. at 21:23-22:6,

27

28

16

1   25:3-6.)[7]  Although there is a dispute as to whether the dogs

2   were barking when they ran out of the bedroom, (see Ceja Dep. at

3   25:8-11 (barking); Garcia Dep. at 25:5-6 (barking); Van Asperen

4   Dep. at 27:16-21, 39:11-14 (not barking); Vitalie Dep. at 60:19-

5   25 (barking)), it is undisputed that they were barking before

6   they escaped from the bedroom, (see Garcia Dep. at 25:11-12; Van

7   Asperen Dep. at 26:10-12, 38:21-23; Vitalie Dep. at 60:5-12).

8          Resolving these factual disputes in favor of plaintiff,

9   the question here is whether it was clearly established on

10  December 17, 2012 that an officer's shooting of a dog while

11  conducting a lawful residential search violates the Fourth

12  Amendment when the dog is running toward the officer after

13  unexpectedly escaping from a room and after less intrusive

14  methods to control the dog have failed.  Although the Supreme

15  Court does "not require a case directly on point" to clearly

16  establish the right at issue, "existing precedent must have

17  placed the statutory or constitutional question beyond debate."

18  al-Kidd, 563 U.S. at 741.

19          Plaintiff contends that this right was clearly

20  established in light of Hells Angels.  In that case, the Ninth

21  Circuit held it was clearly established in 2005 "that the Fourth

22  Amendment forbids the killing of a person's dog, or the

23  destruction of a person's property, when that destruction is

24

25          [7]    Although Van Asperen believed one of the dogs was
26  running to him, it is undisputed that Deputy Garcia "was right in
    front of" Van Asperen when the pit bull ran toward them and that
27  Deputy Garcia's firearm was approximately "a foot" from Van
    Asperen's face when he shot the pit bull.  (Van Asperen Dep. at
28  28:3-7, 41:11-13, 64:18-22.)

1  unnecessary--i.e., when less intrusive, or less destructive,

2  alternatives exist." <u>Hells Angeles</u>, 402 F.3d at 977-78.  The

3  <u>Hells Angels</u> court concluded that "[a] reasonable officer should

4  have known that to create a plan to enter the perimeter of a

5  person's property, knowing all the while about the presence of

6  dogs on the property, without considering a method for subduing

7  the dogs besides killing them, would violate the Fourth

8  Amendment." <u>Id.</u> at 978.

9         The <u>Hells Angels</u> case addressed the unconstitutionality

10 of the shooting of dogs in two different searches conducted

11 simultaneously as part of the same investigation.  <u>Id.</u> at 967.

12 In the first search of James Souza's residence, the officers

13 learned about one week prior to the search that the Souzas had

14 two guard dogs, one of which was a Rottweiler that was known to

15 attack without provocation.  <u>Id.</u> at 968.  Despite their knowledge

16 of these dogs in the week prior to the search, the only plan that

17 the officers developed to handle the dogs was to "isolate or to

18 shoot." <u>Id.</u>  The Ninth Circuit emphasized that the officers had

19 "no plan to use non-lethal methods of incapacitation," never

20 formulated a "specific plan for 'isolating' the dogs," and never

21 intended to give "Souza the opportunity to isolate his Rottweiler

22 himself." <u>Id.</u>  At the time the officer shot Souza's Rottweiler,

23 the search team was already "safely inside" the Souza residence

24 and the dogs were in the backyard without access to the inside of

25 the house.  <u>Id.</u>  As the Ninth Circuit pointed out, "the teams

26 could have conducted their search inside the house without

27 hurriedly dealing with the dogs in the backyard." <u>Id.</u>

28        The second search and shootings in <u>Hells Angels</u>

1    occurred at the Vieira residence.  The officers also had about

2    one week to plan for that search, knew that there might be dogs

3    present, and learned during their briefing on the morning of the

4    search that the residence was guarded by three large dogs.  <u>Id.</u>

5    at 969.  The officers' plan to deal with the dogs at the Vieira

6    residence was to "poke them through the fence with [a] shotgun

7    and try to scare them" and, "[i]f that did not work, . . . to

8    assess the situation and engage the dogs."  <u>Id.</u>   When the

9    officers encountered the dogs, they were behind a tall, padlocked

10   fence that the officers wanted to enter to gain access to the

11   residence.  <u>Id.</u>  The dogs therefore did not pose an immediate

12   threat to the safety of the officers, but the officers did not

13   give the Vieiras the opportunity to restrain the dogs because

14   they wanted "to secure quick entry to preserve an element of

15   surprise and prevent the possible destruction of evidence."  <u>Id.</u>

16   After unsuccessfully attempting to prompt the dogs to retreat

17   from the gate by yelling at them and poking one with a gun, an

18   officer shot two of the dogs at point blank range and killed

19   them.  <u>Id.</u>

20          Unlike the shootings in <u>Hells Angels</u>, the Deputies here

21   had no advance notice that pit bulls were on the premises to be

22   searched.  (<u>See</u> Lazaro Dep. at 46:21-48:13.)  It is undisputed

23   that Deputy Lazaro asked his confidential informant for

24   Edgington's address only "days before" the probation search and

25   followed up with Yolo County Superior Court to confirm the

26   address "either the day of or the day before" the search.  (<u>Id.</u>

27   at 7:25-8:2, 13:14-21.)  It is also undisputed that Deputies Ceja

28   and Garcia were only briefed on the probation search "that same

1    day, prior to going there." (Ceja Dep. 6:24-7:20; Garcia Dep. at

2    11:2-4.)  Plaintiff conceded that none of the Deputies had ever

3    visited her House prior to the probation search, (Niesen Dep. at

4    87:9-88:22), and the Deputies had no evidence particular to

5    plaintiff's House prior to the search that suggested dogs would

6    be there, (see Lazaro Dep. at 46:21-48:13).  Unlike in Hells

7    Angels, therefore, the need to develop a plan to handle dogs at

8    the House would not have been as obvious to a reasonable officer

9    in this case.

10          Of equal importance is the fact that, unlike the

11   officers in Hells Angels, the Deputies here did not immediately

12   resort to shooting plaintiff's dogs.  Initially, the Deputies

13   asked Van Asperen to clear the pit bulls from the bedroom, which

14   is exactly the type of response the Ninth Circuit suggested the

15   officers in Hells Angels should have considered.  See 402 F.3d at

16   968 (emphasizing that the officers' plan did not include "giving

17   Souza the opportunity to isolate his Rottweiler himself" and that

18   the officers "had no intention of calling on the Vieiras to

19   control their dogs").  Although plaintiff contends the Deputies

20   should have contacted her to remove the dogs, there is no

21   evidence that, at the time of the search, the Deputies knew the

22   dogs belonged to plaintiff, knew where plaintiff was, or knew how

23   to reach her.  (See Lazaro Dep. at 46:21-48:13; Ceja Dep. at

24   36:19-24; Garcia Dep. at 36:20-25; Nevis Dep. at 22:21-25.)

25          Despite having been in the House with the dogs while

26   plaintiff was gone, Van Asperen refused to remove the dogs from

27   the bedroom because he was concerned that they would bite him if

28   he went inside the bedroom: "I thought it could be a possibility

                                  20

1  if I tried to go in [the bedroom] . . . I could be bit." (Van

2  Asperen Dep. at 58:16-18.)  He states that the Deputies'

3  probation search "had the dogs riled up.  And there's no way I'm

4  going in there.  You know, that's [the pit bulls'] place.  That's

5  their house . . . yeah, I was actually scared.  Get the dogs all

6  riled up and then send me in there.  I don't think so." (Id. at

7  23:21-24:3; see also id. 24:10-12 (testifying that, "if someone

8  [the dogs] didn't know went into [plaintiff's bedroom] without

9  her being there, I don't know what they would do").)

10         After Van Asperen refused to go in the bedroom to

11  secure the dogs, the Deputies requested Animal Control to help

12  remove the dogs and waited for their arrival. (Lazaro Dep. at

13  29:23-30:7.)  The Animal Control Officers intended to safely

14  remove the dogs from the room with a snare pole. (Nevis Dep. at

15  12:5-13:25.)  When that plan unexpectedly went awry because the

16  second dog jumped over the snared dog, Deputy Lazaro attempted to

17  subdue the second dog with his Taser. (Lazaro Dep. at 30:11-

18  32:14.)  Again, this is exactly the type of force the Ninth

19  Circuit suggested should have been utilized in Hells Angels

20  before the officers shot the dogs.  See 402 F.3d at 969 & n.8

21  (noting that none of the officers attempted to use the pepper

22  spray they had or brought a Taser with them).  Only after the

23  third dog unexpectedly dislodged the Taser wires and the two dogs

24  escaped from the bedroom, did the Deputies resort to deadly

25  force. (Ceja Dep. at 21:1-23:12.)

26         It is also undisputed that Deputy Ceja observed

27  Deputy Lazaro's failed attempt at using his Taser to subdue the

28  second pit bull. (Id. at 20:17-21:24.)  The undisputed evidence

1    also establishes that the Deputies were surprised at the pit

2    bulls' escape from the bedroom.  (See id.; Nevis Dep. at 12:5-

3    13:25); cf. Hells Angels, 402 F.3d at 977 (recognizing that "the

4    governmental interest of [officer] safety might have provided a

5    sound justification for the [killing of the dogs] had the

6    officers been surprised by the presence of the dogs").

7         The risk to the Deputies at the time the force was used

8    is also distinguishable from Hells Angels.  At the Souza

9    residence, the officer shot the dog in the backyard even though

10   it did not pose any threat to the safety of the search team in

11   the house and there was no immediate need to go into the

12   backyard.  Hells Angels, 402 F.3d at 968.  Similarly, at the

13   Vieira residence, the officers were protected from the dogs by a

14   locked fence and the officers' only reason for shooting the dogs

15   was to allow quicker access to the house.  Id. at 969.  The Ninth

16   Circuit emphasized that the officers killed the dogs only to

17   advance their "interest in preserving evidence," id. at 978, not

18   to protect their safety.

19        In finding that reasonable officers would have known

20   that the shootings in Hells Angels ran afoul of the Fourth

21   Amendment, the Ninth Circuit distinguished the case from "the

22   kind where the officer was reacting to a sudden unexpected

23   situation, where the officers were confronted with exigent

24   circumstances."  Id.  The Supreme Court has also emphasized that

25   courts must allow "for the fact that police officers are often

26   forced to make split-second judgments--in circumstances that are

27   tense, uncertain, and rapidly evolving--about the amount of force

28   that is necessary in a particular situation."  Graham v. Connor,

1   490 U.S. 386, 397 (1989); see Mattos v. Agarano, 661 F.3d 433,

2   442 (9th Cir. 2011) (applying this principle to the clearly

3   established inquiry).  This is precisely that type of case, where

4   the officers attempted to use several less intrusive methods to

5   remove the dogs without harming them and resorted to shooting

6   them only after those attempts were unsuccessful and the dogs

7   unexpectedly escaped and were running toward the officers.

8           While plaintiff does not dispute that the Fourth

9   Amendment would have allowed the Deputies to shoot her dogs if

10  they posed an imminent threat to the Deputies, she strongly

11  disputes whether her dogs were attempting to attack the Deputies

12  or would have attacked them if they had not been shot.  Even

13  assuming, as the court must on summary judgment, that the dogs

14  were friendly and merely running toward the Deputies to greet

15  them and thus the Deputies mistakenly believed that the dogs were

16  going to attack them, the court finds for purposes of qualified

17  immunity that such a mistake of fact was reasonable.  See

18  Pearson, 555 U.S. at 231 (stating that "qualified immunity

19  applies" to an official's "mistake of fact").  The objective

20  facts known to the Deputies at the time the dogs were running

21  toward them were that the dogs had been isolated from the other

22  occupants of the House in a bedroom where they were barking and

23  riled up and Van Asperen, who was familiar with the dogs, did not

24  want to go into the bedroom to remove them because of how the

25  dogs were reacting to the Deputies' search.

26          The Deputies were also dealing with a breed of dog that

27  is known for fighting, aggressive behavior, and causing serious

28  injury.  These general characteristics made the belief that this

23

1  breed of dog is more likely to attack and was about to attack

2  even more reasonable.  (See Nevis Dep. at 27:11-17 (explaining

3  that the typical breed that officers see for fighting dogs are

4  pit bulls); see also United States v. Sutton, 336 F.3d 550, 551

5  (7th Cir. 2003) ("[T]he police discussed several potential

6  threats to officer safety--including the fact that pit bull dogs

7  (known for their hostility to strangers) had been seen on the

8  property."); Altman v. City of High Point, 330 F.3d 194, 206 (4th

9  Cir. 2003) ("[P]it bulls, like Rottweilers, are a dangerous breed

10  of dog."); Vanater v. Village of South Point, 717 F. Supp. 1236,

11  1240-41 (S.D. Ohio 1989) ("Pit Bulls . . . possess the quality of

12  gameness, which is not a totally clear concept, but which can be

13  described as the propensity to catch and maul an attacked victim

14  unrelentingly until death occurs, or as the continuing tenacity

15  and tendency to attack repeatedly for the purpose of killing.  It

16  is clear that the unquantifiable, unpredictable aggressiveness

17  and gameness of Pit Bulls make them uniquely dangerous."); see

18  generally Russell G. Donaldson, Annotation, Validity and

19  Construction of Statute, Ordinance, or Regulation Applying to

20  Specific Dog Breeds, Such as "Pit Bulls" or "Bull Terriers", 80

21  A.L.R. 4th 70 (1990).

22        Unlike people, dogs can never state their "intent" and,

23  while an owner of a dog may develop such a bond that allows her

24  to better predict what the animal might do based on its behavior,

25  a dog's behavior can never be predicted with certainty and none

26  of the Deputies were familiar with plaintiff's dogs so as to give

27  them any insight into their tendencies.  (See, e.g., Lazaro Dep

28  at 55:7-11 (stating that "[p]it bulls are difficult to read

24

1   [because] they could have the same look whether they're going to

2   bite you or . . . they want to get pet").)  After the dogs had

3   unexpectedly escaped from the bedroom in which they were confined

4   and barking and were running toward the Deputies, a reasonable

5   conclusion of the Deputies, if not the only reasonable

6   conclusion, was that the dogs were about to attack the strangers

7   in the House.  (See, e.g., Nevis Dep. at 33:10-12 (testifying

8   that the pit bulls appeared very much like they were going to

9   attack).)

10          "[T]he Fourth Amendment does not require omniscience,

11  and absolute certainty of harm need not precede an act of self-

12  protection."  Wilkinson v. Torres, 610 F.3d 546, 553 (9th Cir.

13  2010) (quotation marks omitted).  A reasonable officer would thus

14  not believe that, after exhausting less intrusive methods, the

15  law required him to give the dog the benefit of the doubt and

16  wait until the dog's jaws are locked on the officer before

17  shooting.  Accord Dziekan v. Gaynor, 376 F. Supp. 2d 267, 272 (D.

18  Conn. 2005) ("Defendant had heard from plaintiff that the dog

19  would not bite, but he had no way to ascertain the truth of that

20  representation within the time period at issue.  Under such

21  circumstances, the law does not require the officer to wait until

22  the approaching animal is within biting distance or is leaping at

23  him before taking protective action."); Birkes v. Tillamook

24  County, Civ. No. 09-1084 AC, 2011 WL 1792135, at *7 (D. Or. May

25  10, 2011) ("Here, [the officer] was faced with a pit bull moving

26  toward him in a rapid manner which the dog's guardian could not

27  restrain. . . . [T]hese facts are enough to establish that [the

28  officer] acted reasonably [in shooting the dog]."); Perez v. City

1  of Placerville, Civ. No. S-07-927 FCD GGH, 2008 WL 4279386, at

2  *7-8 (E.D. Cal. Sept. 9, 2008) (citing Hells Angels in holding

3  that an officer "did not violate plaintiff's Fourth Amendment

4  rights" in killing the plaintiff's dog where the officer

5  "responded first with pepper spray," only when "that did not work

6  did he use his weapon to shoot [the dog]," and "[w]ithin twenty

7  minutes of the shooting, the officers transported [the dog] to

8  the nearest veterinarian's office"); cf. Hunter v. Bryant, 502

9  U.S. 224, 229 (1991) ("Th[e] accommodation for reasonable error

10  exists because 'officials should not err always on the side of

11  caution' because they fear being sued." (citation omitted)).

12      Accordingly, because the Deputies resorted to shooting

13  the dogs only after less intrusive methods had proven

14  unsuccessful and were reasonable in believing that the pit bulls

15  running toward them were about to attack, they did not violate a

16  clearly established Fourth Amendment right and are thus entitled

17  to qualified immunity.  The court must therefore grant the

18  Deputies' motion for summary judgment on plaintiff's Fourth

19  Amendment claim based on the shooting of her dogs.[8]

20          2.   Officers' Liability for Shooting the Dogs

21      The Officers argue that they cannot be held liable for

22  seizing the killed dogs because they did not participate in

23  shooting the dogs.  The Ninth Circuit has "reject[ed] the idea

24  that mere presence at a search or membership in a group, without

25

26  ───────────────
        [8]   Because the court determines that the Deputies are
27  entitled to qualified immunity, it need not address Deputy
    Lazaro's separate argument that he cannot be liable for the
28  shootings because he did not participate in them.

1  personal involvement in and a causal connection to the unlawful

2  act, can create liability under section 1983." Jones v.

3  Williams, 297 F.3d 930, 939 (9th Cir. 2002).  Consequently, an

4  officer who is merely a bystander to his colleagues' allegedly

5  unlawful conduct cannot be found to have caused any injury.

6  Hopkins v. Bonvicino, 573 F.3d 752, 770 (9th Cir. 2009); see also

7  Chuman v. Wright, 76 F.3d 292, 295 (9th Cir. 1996) (rejecting a

8  jury instruction in a § 1983 case allowing the jury to "lump all

9  the defendants together, rather than require it to base each

10  individual's liability on his own conduct").

11       Under the integral participation doctrine, the Officers

12  may be liable under § 1983 for the shooting of the two dogs if

13  they were "fundamentally involved" in the shootings by (1) being

14  aware of the plan to shoot the dogs or having reason to know of

15  such a plan without objecting to it; and (2) providing some

16  affirmative physical support at the scene of the shootings.

17  Monteilh v. County of Los Angeles, 820 F. Supp. 2d 1081, 1089

18  (C.D. Cal. 2011).  Plaintiff has not presented any evidence that

19  a plan to shoot the dogs existed or, that once the split-second

20  decision to shoot was made, the Officers knew or had reason to

21  know of the decision.  Plaintiff also fails to put forth any

22  evidence that Officer Bigelow was inside the House at the time

23  Deputies Ceja and Garcia shot plaintiff's two pit bulls.  Nor

24  does plaintiff dispute defendants' evidence that Officer Bigelow

25  arrived on the scene after the shootings and that his only

26  involvement was in removing the remaining five dogs from the

27  House.  (Nevis Dep. at 14:7-10; Bigelow Dep. at 15:17-17:12.)

28       As a matter of law, therefore, neither Officer Nevis

27

1    nor Officer Bigelow was an integral participant in the shooting

2    of plaintiff's two dogs.  See Hopkins, 573 F.3d at 770 ("[I]t is

3    clear that an officer who waits in the front yard interviewing a

4    witness and does not participate in the unconstitutional search

5    in any fashion cannot be held liable under [§ 1983].");

6    Blankenhorn, 485 F.3d at 481 n.12 ("Roman, who arrived on the

7    scene after the arrest was completed, and Montano, who at most

8    provided crowd control, did not participate in any integral way

9    in the arrest.  Therefore, summary judgment in their favor was

10   properly granted.").  Accordingly, the Officers cannot be held

11   liable under § 1983 for the shooting of the two dogs and, even if

12   they could, they would be entitled to qualified immunity for the

13   same reasons as the Deputies.

14        B.   Removal of the Remaining Dogs

15             1.   Officers' Liability for Removing the Dogs

16        The Officers contend that they are entitled to

17   qualified immunity for removing the remaining five dogs from the

18   House.  The court will again assume, without deciding, that the

19   Officers' removal of plaintiff's five dogs violated her Fourth

20   Amendment right for purposes of qualified immunity and determine

21   whether that right was clearly established.  See Reichle, 132 S.

22   Ct. at 2093.

23        It is undisputed that Van Asperen and Vitalie, who were

24   the only occupants in the House after the shooting, were arrested

25   and thus the five remaining dogs would have been left unattended

26   if they were not removed.  (Nevis Dep. at 22:19-23:19.)  The

27   relevant inquiry is thus whether, at the time the Officers

28   removed plaintiffs' dogs on December 17, 2012, it was clearly

1   established that the Fourth Amendment prohibited animal control

2   officers who are lawfully inside a home to remove dogs when the

3   only occupants are arrested and the dogs would remain unattended.

4           "[A]n officer who acts in reliance on a duly-enacted

5   statute or ordinance is ordinarily entitled to qualified

6   immunity."  Grossman v. City of Portland, 33 F.3d 1200, 1209 (9th

7   Cir. 1994).  Under California Penal Code § 597.1, which was in

8   effect at the time of the dogs' removal, "[e]very owner, driver,

9   or keeper of any animal who permits the animal to be in any

10  building [or] enclosure . . . without proper care and attention

11  is guilty of a misdemeanor."  Cal. Penal Code § 597.1(a)(1)

12  (2012).[9]  Section 597.1 specifically provides that "[a]ny peace

13  officer . . . or animal control officer shall take possession of

14  the stray or abandoned animal and shall provide care and

15  treatment for the animal until the animal is deemed to be in

16  suitable condition to be returned to the owner."  Id.  "When the

17  officer has reasonable grounds to believe that very prompt action

18  is required to protect the health or safety of the animal or the

19  health or safety of others, the officer shall immediately seize

20  the animal . . . ."  Id.  Officer Nevis explained that, "[i]f a

21  person ends up going to jail, we take their dogs or their fish or

22  their goat or their snake or whatever [the animal] happens to be.

23  We end up taking it and putting it in our custody" because "if

24  you're taking away the only people that are going to be there,

25  you can't leave those [animals] by themselves."  (Nevis Dep. at

26

27  _____

            [9]   The statute was amended on January 1, 2013 without
28  substantive change.

                                29

1  23:3-19.)

2          There is no evidence suggesting that the Officers knew

3  when someone might return to care for the dogs and ensure that

4  they had adequate food and water.  (See id. at 22:17-23:24.)  The

5  removal also occurred in mid-December and there is no evidence

6  that the dogs in the backyard kennel were sheltered from the cold

7  or rain.  Officer Nevis further testified that, as he and Officer

8  Bigelow were removing the remaining dogs from the House following

9  the shooting, plaintiff's next-door neighbor approached them and,

10  after describing the dogs as "aggressive," told the Officers:

11  "Thank God you're taking these dogs because they get out all the

12  time and they chase people on a regular basis."  (Id. at 31:21-

13  32:11.)  The circumstances and neighbor's statements could

14  provide reasonable animal control officers in the same situation

15  additional reasonable grounds to believe that the dogs' removal

16  was "required to protect the health or safety of the [dogs] or

17  the . . . safety of" the surrounding neighbors and, thus, that

18  they were required to "seize the animal[s]" pursuant to

19  California Penal Code § 597.1(a)(1).

20          Plaintiff has not provided and the court cannot find

21  any authority prohibiting the Officers' conduct or establishing

22  that the removal of the dogs under the circumstances of this case

23  violated the Fourth Amendment.  In the absence of any statutory

24  or case law contrary to the clear duties imposed by California

25  Penal Code § 597.1, the contours of plaintiff's Fourth Amendment

26  right were not sufficiently clear such that every reasonable

27  animal control officer would have suspected, let alone have fair

28  notice, that his conduct amounted to an unreasonable seizure of

30

1  plaintiff's property.  See Mullenix v. Luna, 136 S. Ct. 305, 314

2  (2015) (per curiam) ("[T]he crux of the qualified immunity test

3  is whether officers have 'fair notice' that they are acting

4  unconstitutionally.").  Accordingly, because the Officers are

5  entitled to qualified immunity on plaintiff's claim for the

6  unlawful seizure of her dogs, the court must grant their motion

7  for summary judgment on that claim.

8          2.   Deputies' Liability for Removing the Dogs

9          Even assuming that the Deputies were integral

10  participants in the removal of the five remaining dogs from

11  plaintiff's House and may be liable under § 1983, the Deputies

12  would be entitled to qualified immunity for the same reasons as

13  the Officers and thus the court must grant the Deputies' motion

14  for summary judgment on plaintiff's claim against them for the

15  unlawful seizure of her remaining dogs.

16     C.   Unlawful Arrest

17          Plaintiff alleges that she "was arrested and held in

18  custody for two days even though there was no evidence that she

19  had committed a crime." (Compl. ¶ 24.)  At oral argument,

20  counsel for plaintiff conceded that only Deputies Lazaro and Ceja

21  had any involvement in plaintiff's arrest.

22          "A claim for unlawful arrest is cognizable under § 1983

23  as a violation of the Fourth Amendment, provided the arrest was

24  without probable cause or other justification." Lacey, 693 F.3d

25  at 918 (quotation marks omitted).  Probable cause exists if the

26  arresting officers "had knowledge and reasonably trustworthy

27  information of facts and circumstances sufficient to lead a

28  prudent person to believe that the arrestee had committed or was

31

1    committing a crime." <u>Maxwell v. County of San Diego</u>, 697 F.3d

2    941, 951 (9th Cir. 2012) (citation and alterations omitted).

3    Under the collective knowledge doctrine, a court looks to the

4    collective knowledge of all the officers involved in the criminal

5    investigation.  <u>Torres v. City of Los Angeles</u>, 548 F.3d 1197,

6    1207 (9th Cir. 2008).  Once probable cause is established, "an

7    officer is under no duty to investigate further or to look for

8    additional evidence which may exculpate the accused." <u>Cameron v.</u>

9    <u>Craig</u>, 713 F.3d 1012, 1019 (9th Cir. 2013) (citation omitted).

10           It is undisputed that Deputy Lazaro, after returning

11   from the December 17, 2012 probation search, filled out and

12   signed a declaration for probable cause to arrest plaintiff for

13   possession of .35 grams of methamphetamine, a felony at the time,

14   and possession of drug paraphernalia found in her bedroom.

15   (Lazaro Dep. at 45:19-46:14.)  It is also undisputed that, on

16   December 19, 2012, Deputy Ceja arrived at plaintiff's House with

17   three other deputies who were not involved in the probation

18   search--Deputies Hembree, Whitehead, and Mount--and arrested

19   plaintiff pursuant to Deputy Lazaro's probable cause declaration.

20   (Ceja Dep. at 37:19-40:23, 59:20-65:3.)  It is further undisputed

21   that Deputy Ceja received and read the probable cause declaration

22   before arresting plaintiff and that he relied on the declaration

23   in arresting plaintiff.  (<u>Id.</u> at 59:20-65:3.)

24           As a matter of law, probable cause existed to arrest

25   plaintiff on December 19, 2012, and counsel for plaintiff

26   conceded as much at oral argument.  Accordingly, because there

27   was probable cause to arrest plaintiff on December 19, 2012, the

28   court must grant defendants' motions for summary judgment on her

1   unlawful arrest claim.[10]

2               IT IS THEREFORE ORDERED that:

3               (1) defendants Lech Garcia, Juan Ceja, and Jerry

4   Lazaro's motion for summary judgment, (Docket No. 20), be, and

5   the same hereby is GRANTED on all of plaintiff's claims; and

6               (2) defendants Michael Nevis and Vanus Bigelow's motion

7   for summary judgment, (Docket No. 21), be, and the same hereby

8   is, GRANTED on all of plaintiff's claims.

9   Dated:   July 5, 2016

10                                    _____
                                      WILLIAM B. SHUBB
11                                    UNITED STATES DISTRICT JUDGE

12

13

14

15

16

17

18

19

20   _____

21       [10]   Although plaintiff argues that Deputy Lazaro and Ceja
     arrested her to intimidate her so that she would not complain
22   about what had happened to her dogs, the Deputies' subjective
     intent is not relevant to determining probable cause.  See
23   Devenpeck v. Alford, 543 U.S. 146, 153 (2004) ("Our cases make
     clear that an arresting officer's state of mind . . . is
24   irrelevant to the existence of probable cause.").
         Plaintiff argues in her opposition that Deputy Ceja
25   used force when arresting her, but counsel acknowledged at oral
     argument that those allegations are not relevant to plaintiff's
26   wrongful arrest claim and that she did not assert an excessive
     force claim in her Complaint.  See Beier v. City of Lewiston, 354
27   F.3d 1058, 1064 (9th Cir. 2004) (stating that the unlawful arrest
     and excessive force inquiries are distinct).
28

                                    33